2010 UT 33

**Wendy GUDMUNDSON and Kay Gudmundson, Plaintiffs and Appellants,**

v.

**DEL OZONE; OzoneSolutions, L.C.; Johnson Controls, Inc.; and John and Jane Does 1–10, Defendants and Appellees.**

No. 20080537.

Supreme Court of Utah.

May 14, 2010.

Randall K. Edwards, Rick S. Lundell, Brian K. Lofgren, Salt Lake City, for plaintiffs.

John R. Lund, R. Scott Young, Scott Powers, Salt Lake City, for defendant Del Ozone.

Heinz J. Mahler, Salt Lake City, for defendant OzoneSolutions, L.C.

Joseph E. Minnock, Sara N. Becker, Salt Lake City, Brian C. Lewis, Richard K. Wray, Chicago, IL, for defendant Johnson Controls, Inc.

Brent Gordon, Idaho Falls, ID, for amici Utah Association for Justice.

NEHRING, Justice:

## INTRODUCTION

¶ 1 This appeal comes from a district court's grant of summary judgment on Ms. Gudmundson's claims against third parties for injuries she sustained in the workplace. Ms. Gudmundson, a former employee of the Utah State Prison, claims that ozone exposure from a newly installed ozone-laundry system injured her, causing significant brain injuries.

¶ 2 Ms. Gudmundson initially sought workers' compensation benefits. The Utah Labor Commission denied her claim because it concluded there was no causal link between her condition and her employment. In her subsequent civil action, the district court held that because the administrative law judge who presided over Ms. Gudmundson's workers' compensation proceeding against the State determined her injuries were not medically caused by ozone exposure, she was collaterally estopped from recovering damages from the installers, distributors, and manufacturers of the ozone-generating system. We affirm in part and reverse in part.

## BACKGROUND

¶ 3 In December 2004, an ozone-generating system was installed in the Wasatch Laundry Facility of the Utah State Prison. The State contracted with Johnson Controls, which hired OzoneSolutions, L.C., to furnish the ozone system. OzoneSolutions contracted with Del Ozone, a component manufacturer, to provide the ozone generator.

¶ 4 At that time Wendy Gudmundson worked as a supervisor at the laundry facility. The ozone generator was first operated in the prison on December 13, 2004; Ms. Gudmundson complained of a headache the next day. She had similar headaches the next few days but continued to go to work. She went to the hospital on December 20 and was administered an MRI, which showed

normal findings. The hospital also administered a spinal tap because her headache symptoms suggested meningitis. Ms. Gudmundson did not return to work at the prison. On January 27, 2005, she returned to the hospital and was diagnosed with a Chiari I Malformation, a condition requiring surgery on her brain stem.

¶ 5 In May 2005, Ms. Gudmundson filed an Application for Hearing with the Utah Labor Commission seeking compensation for her injuries, which she believed were due to ozone overexposure. Ms. Gudmundson alleged that she had sustained an occupational disease under Chapter 3, rather than a workplace injury under Chapter 2, of Utah Code Title 34A. The Utah Labor Commission requested an independent medical examination from Dr. Edwin Holmes. Dr. Holmes concluded that the Chiari I Malformation could not be caused by exposure to ozone, that Ms. Gudmundson had not shown common symptoms of ozone overexposure, and that the presence of the Chiari I Malformation was coincidental to the installation of the ozone-generator system. A panel commission headed by Dr. Joseph Jarvis, a physician whose participation was stipulated to by the parties, agreed with this analysis. As a result, Administrative Law Judge Debbie Hann (the "ALJ") denied Ms. Gudmundson's workers' compensation claim, citing lack of medical causation.

¶ 6 In September 2005, Ms. Gudmundson and her husband sued Johnson Controls, OzoneSolutions, and Del Ozone alleging negligent installation, strict liability based on a defective product, res ipsa loquitur, breach of implied warranty and merchantability, and negligent manufacture.[1]

¶ 7 Nearly two years after the commencement of the suit, Ms. Gudmundson changed counsel. Although Ms. Gudmundson claimed that the parties agreed in a telephone conference to extend the discovery deadline, all three defendants filed for summary judgment. In response, Ms. Gudmundson sought leave under rule 56(f) of the Utah Rules of Civil Procedure to conduct additional discovery to develop various elements of her claims.[2]

¶ 8 The district court denied Ms. Gudmundson's rule 56(f) motion and granted summary judgment in favor of all three defendants. The court denied the rule 56(f) motion because it had twice extended the discovery deadline and reasoned that Ms. Gudmundson had not adequately explained why her claims would survive summary judgment if given the benefit of additional discovery. The district court next determined that Ms. Gudmundson was collaterally estopped from challenging causation in her suit because the ALJ had already determined that her disease was not medically caused by the ozone-generator system. The court granted summary judgment to the defendants because it concluded that all of Ms. Gudmundson's claims required some showing of causation and that she had the opportunity to fully and fairly litigate causation in her workers' compensation proceeding. The district court also granted summary judgment to Del Ozone on the alternative ground that Ms. Gudmundson had not shown that the ozone generator was defective as required to prevail on her products liability claim.

¶ 9 Ms. Gudmundson appeals the district court's denial of her rule 56(f) motion, its determination that her claims against appellees were collaterally estopped, and its determination that she could not recover from Del Ozone because she had not presented evidence that the ozone generator was defective.

**1.** Ms. Gudmundson also appealed to the Labor Commission's Appeals Board on November 2, 2006, seeking to reopen the proceedings. Ms. Gudmundson wished to pursue a different theory, namely, that the ozone exposure caused her to have a spinal tap, which, in turn, caused the Chiari I Malformation. The Appeals Board affirmed the ALJ's decision and declined to reopen the proceedings. Ms. Gudmundson did not appeal this decision to the court of appeals as permitted by the Utah Administrative Procedures Act.

**2.** Depositions have been taken from Doug Wright, facilities coordinator at the Utah Department of Corrections; George Eddleman, former laundry employee at the Utah Department of Corrections; John Downey, part owner of OzoneSolutions; and Ms. Gudmundson. Ms. Gudmundson has since obtained experts that have diagnosed her with complications due to ozone byproducts such as chemical encephalopathy, chemical sensitivity, and vagal maladaption.

Also at issue in this appeal is Del Ozone's and Johnson Controls' argument that this court does not have subject-matter jurisdiction over this case due to the untimeliness of Ms. Gudmundson's notice of appeal. We review each issue below.

## STANDARD OF REVIEW

 ¶ 10 "We review the district court's decision to grant summary judgment for correctness, granting no deference to the [district] court." *Daniels v. Gamma W. Brachytherapy, LLC,* 2009 UT 66, ¶ 40, 221 P.3d 256 (alteration in original) (internal quotation marks omitted). We review the district court's rule 56(f) decision under an abuse of discretion standard, asking whether the "grant or denial exceed[s] 'the limits of reasonability.'" *Price Dev. Co. v. Orem City,* 2000 UT 26, ¶ 9, 995 P.2d 1237 (quoting *Crossland Sav. v. Hatch,* 877 P.2d 1241, 1243 (Utah 1994)).

## ANALYSIS

### I. THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS APPEAL

 ¶ 11 Del Ozone and Johnson Controls contend this court does not have jurisdiction over this appeal as to them because Ms. Gudmundson did not file a timely notice of appeal naming them as parties. We disagree and hold that Ms. Gudmundson timely appealed the district court's grant of summary judgment as to all parties.

 ¶ 12 A party wishing to appeal a final judgment or order of a district court must file a notice of appeal "within [thirty] days after the date of entry of the judgment or order appealed from." Utah R.App. P. 4(a). "An appeal may be taken from a district ... court to the appellate court with jurisdiction over the appeal from all final orders and judgments, except as otherwise provided by law...." Utah R.App. P. 3(a). "The final judgment requirement is jurisdictional"; if not met, "we lack jurisdiction over the appeal and must dismiss it." *Powell v. Cannon,* 2008 UT 19, ¶ 12, 179 P.3d 799. "For an order or judgment to be final, it

must dispose of the case as to all the parties, and finally dispose of the subject-matter of the litigation on the merits of the case." *Id.* ¶ 11 (internal quotation marks omitted). The order from which a party appeals is not final if "action[s] against other defendants ... remain[ ] alive." *Kennedy v. New Era Indus., Inc.,* 600 P.2d 534, 536 (Utah 1979).

¶ 13 Here, the district court granted summary judgment to Del Ozone and Johnson Controls in an order dated March 24, 2008. It did not grant summary judgment to OzoneSolutions, however, because it found OzoneSolutions had not properly filed a separate memorandum in support of its motion for summary judgment. In response to the March 24 order, Ms. Gudmundson filed her first notice of appeal on April 2. The notice contained all three defendants as named parties and was given an appellate case number. Because the March 24 order did not include OzoneSolutions, however, it was not final as to all parties and was not appealable under our rules. Accordingly, this court issued an order dismissing Ms. Gudmundson's first notice of appeal without prejudice because it was filed prematurely.

¶ 14 Shortly after the March 24 order, OzoneSolutions filed a separate memorandum in support of summary judgment. The district court granted the motion on May 28, 2008. The court explained that it "hereby incorporates by reference its prior analysis as reflected in the Del Ozone summary judgment," and concluded that "this Ruling and Order shall constitute the final Order of the Court on this matter. No further Order need be submitted by the parties."

¶ 15 In response, Ms. Gudmundson filed her second notice of appeal on June 4, 2008. The caption included all three defendants. Ms. Gudmundson also stated that she wished to "consolidat[e]" the second notice of appeal with the first notice of appeal because it stemmed "from the same claim, ar[ose] from the same set of facts, and the [second] order ... was based on the same legal theories and findings as the [first] order." The body of the appeal, however, stated that Ms. Gudmundson "appeals to the Utah Supreme Court the Ruling and Order Granting Defendant OzoneSolutions' Motion for Summary

Judgment." On June 27, this court sent a letter with a different case number than the number assigned to the first notice of appeal, advising the parties that "the notice of appeal in this case has been filed." [3]

¶ 16 Del Ozone and Johnson Controls argue that this second notice of appeal is not an appeal from the March 24 order granting summary judgment to them. Rather, they claim that because the May 28 summary judgment order named only OzoneSolutions, any reference to Del Ozone or Johnson Controls in the second notice of appeal has no jurisdictional effect. We disagree.

¶ 17 The district court clearly stated that the May 28 summary judgment order operated as the final appealable order of the court. Although the second notice of appeal is not as clear as it could have been, its reference to the first notice of appeal is sufficient to properly subject all three defendants to this court's jurisdiction. Because Ms. Gudmundson filed this second notice of appeal within the required thirty-day period, we conclude Ms. Gudmundson timely appealed as to all parties. Having determined that we have subject-matter jurisdiction over this appeal, we now address whether the district court abused its discretion when it denied Ms. Gudmundson's rule 56(f) motion for additional time to conduct further discovery.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED MS. GUDMUNDSON'S RULE 56(f) MOTION FOR ADDITIONAL TIME FOR DISCOVERY

■ ¶ 18 In response to Del Ozone and Johnson Control's Motions for Summary Judgment, Ms. Gudmundson moved the district court for time to conduct further discovery under rule 56(f) of the Utah Rules of Civil Procedure. Specifically, Ms. Gudmundson argued she needed to conduct discovery on (1) the interpretation of her MRIs, (2) the neurotoxicity or carcinogenic effects of an ozone-disinfectant system, (3) the water be-

ing pulled from a geothermal well below the prison, and (4) further information from Del Ozone relating to Del Ozone's denial of whether any of its instruments that are similar to the generator have ever been known to cause health problems.

¶ 19 The district court denied the motion. It reasoned that "[p]laintiffs have had two-and-a-half years to obtain the necessary evidence to oppose summary judgment, which the Court finds to have been more than adequate to uncover any available evidence to support their claims." The district court further noted that "plaintiffs have failed to identify the specific facts that are within the defendants' exclusive knowledge, the steps that they have taken to obtain that information, and how that information would help them respond to defendants' motions for summary judgment."

■ ¶ 20 "We will not reverse the district court's decision to grant or deny a rule 56(f) motion for discovery unless it 'exceeds the limits of reasonability.'" *Overstock.com, Inc. v. SmartBargains, Inc.,* 2008 UT 55, ¶ 20, 192 P.3d 858 (quoting *Crossland Sav. v. Hatch,* 877 P.2d 1241, 1243 (Utah 1994)). "The 'limits of reasonability' standard is based on the specific circumstances of each case." *Id.* ¶ 21. In *Overstock.com,* we listed some of the relevant considerations in determining whether the grant of a rule 56(f) motion is warranted

(1) an examination of the party's rule 56(f) affidavit to determine whether the discovery sought will uncover disputed material facts that will prevent the grant of summary judgment or if the party requesting discovery is simply on a "fishing expedition," (2) whether the party opposing the summary judgment motion has had adequate time to conduct discovery and has been conscientious in pursuing such discovery, and (3) the diligence of the party moving for summary judgment in respond-

---

**3.** On June 28, Ms. Gudmundson filed a third notice of appeal out of an "abundance of caution." She indicated that to the degree it was unnecessary, the third notice of appeal should be stricken. Because this third notice of appeal was filed thirty-one days after the May 28 summary judgment order, however, it was untimely. *See* Utah R.App. P. 4(a) ("[T]he notice of appeal ... shall be filed ... within [thirty] days after the date of entry of the judgment or order appealed from.").

ing to the discovery requests provided by the party opposing summary judgment. *Id.*

¶ 21 We now review Ms. Gudmundson's conduct measured against these three considerations. Ms. Gudmundson argues that the district court's denial of her rule 56(f) motion exceeds the limits of reasonability because she had just obtained new counsel and because the needed discovery would reveal evidence relevant to her claims. We find neither argument persuasive.

¶ 22 Although Ms. Gudmundson's counsel may be faulted for failing to conduct discovery in a conscientious and diligent manner to some extent, the district court's denial of the rule 56(f) motion was not unreasonable. Ms. Gudmundson filed her complaint on September 20, 2005, and fact discovery closed September 5, 2007. Ms. Gudmundson's current counsel entered his appearance on August 28, 2007. Although Ms. Gudmundson's current counsel entered an appearance only eight days before the close of fact discovery, Ms. Gudmundson has not sufficiently demonstrated that her former counsel was incompetent or otherwise unable to diligently perform the needed discovery. She has not shown *why* her former counsel could not perform the needed discovery.[4] Instead, Ms. Gudmundson concludes that defendants' suggestion in phone conferences that they would stipulate to a discovery extension forms an adequate basis on which to grant a rule 56(f) motion. This argument does nothing to explain why the district court abused its discretion when it found that Ms. Gudmundson had not adequately shown why she could not obtain the needed information within the previous two years.

¶ 23 Although rule 56(f) motions are to be granted liberally, in this case, Ms. Gudmundson's failure to adequately explain the lack of diligence does not convince us that the district court exceeded the limits of reasonability when it denied the motion. *See Jensen v.*

*Smith,* 2007 UT App 152, ¶¶ 2, 4–5, 163 P.3d 657; *Jones v. Bountiful City Corp.,* 834 P.2d 556, 560–62 (Utah Ct.App.1992).

¶ 24 Although the district court did not abuse its discretion when it denied Ms. Gudmundson's rule 56(f) motion, we must still address whether the district court nevertheless erred when it granted summary judgment to Del Ozone and Johnson Controls on the basis of collateral estoppel.

III. THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT TO DEL OZONE AND JOHNSON CONTROLS ON THE BASIS OF COLLATERAL ESTOPPEL BECAUSE MS. GUDMUNDSON'S WORKERS' COMPENSATION ADJUDICATIONS ON THE ISSUE OF CAUSATION DID NOT GARNER PRECLUSIVE EFFECT IN THIS CASE

¶ 25 The core issue in this appeal, and a question we have not confronted before, is whether a district court may give a workers' compensation adjudication on the issue of causation preclusive effect in a civil action against a nonemployer third-party defendant. Stated another way, can a third-party defendant use a workers' compensation adjudication on the issue of causation to block relitigation of that issue in a civil suit?

¶ 26 Ms. Gudmundson contends that the district court erred when it gave preclusive effect to her workers' compensation adjudication in her civil lawsuit against Johnson Controls, OzoneSolutions, and Del Ozone. She further contends that the district court erred when it declined to address whether her alternative theory—that ozone byproducts caused her injuries rather than overexposure to ozone itself—was sufficient to overcome the application of collateral estoppel. We address each issue in turn.

---

4. Indeed, during the hearing on the parties' motions for summary judgment, the district court noted Ms. Gudmundson had failed to present evidence that she could meet the requirements of a rule 56(f) motion. For instance, the district court stated, "You haven't even shown me how the discovery that was conducted under prior counsel failed to give you adequate tools to respond to these motions." The district court also noted, "[Y]ou've failed to point out to me even the slightest bit how none of that discovery could allow you to answer or [to] mount a response to their motion for summary judgment."

### A. The District Court Erred When It Gave Preclusive Effect to Ms. Gudmundson's Workers' Compensation Adjudication

¶ 27 We first address whether the district court erred when it gave Ms. Gudmundson's workers' compensation determination preclusive effect in her civil lawsuit against nonemployer third parties. We conclude that the district court erred.

¶ 28 The Utah Workers' Compensation Act represents a compromise between employee and employer. An injured employee receives " 'a simple and speedy procedure which eliminates the expense, delay and uncertainty' in proving fault," *Workers' Comp. Fund v. Wadman Corp.*, 2009 UT 18, ¶ 8, 210 P.3d 277 (quoting *Wilstead v. Indus. Comm'n*, 17 Utah 2d 214, 407 P.2d 692, 693 (1965)), while the employer is granted immunity from suit by the employee. *See* Utah Code Ann. § 34A–2–105 (Supp.2009) ("The right to recover compensation pursuant to [the Utah Workers' Compensation Act] . . . is the exclusive remedy against the employer and . . . any officer, agent, or employee of the employer. . . .").[5] This compromise does not affect an employee's statutory right to sue negligent third parties. *See* Utah Code Ann. § 34A–2–106(1) (Supp.2009) ("When any injury . . . is caused by the wrongful act or neglect of a person other than an employer, officer, agent, or employee of the employer . . . the injured employee . . . may have an action for damages against the third person.").

¶ 29 Collateral estoppel, or issue preclusion, is a judicially-created doctrine that " 'prevents parties or their privies from relitigating facts and issues in the second suit that were fully litigated in the first suit.' " *Buckner v. Kennard*, 2004 UT 78, ¶ 12, 99 P.3d 842 (quoting *Macris & Assocs. v. Neways, Inc.*, 2000 UT 93, ¶ 19, 16 P.3d 1214). A party seeking to invoke collateral estoppel must show

(1) the issue decided in the prior adjudication is identical to the one presented in the instant action; (2) the party against whom issue preclusion is asserted was a party, or in privity with a party, to the prior adjudication; (3) the issue in the first action was completely, fully, and fairly litigated; and (4) the first suit resulted in a final judgment on the merits.

*Id.* ¶ 13.

¶ 30 Collateral estoppel serves three primary purposes: "(1) preserving the integrity of the judicial system by preventing inconsistent judicial outcomes; (2) promoting judicial economy by preventing previously litigated issues from being relitigated; and (3) protecting litigants from harassment by vexatious litigation." *Id.* ¶ 14.

¶ 31 This court has also recognized, however, that "[c]ollateral estoppel is not an inflexible, universally applicable principle," *Id.* ¶ 15 (internal quotation marks omitted), and that it "can yield an unjust outcome if applied without reasonable consideration and due care." *Id.* Accordingly, its "[a]pplication . . . may be unwarranted in circumstances where its purposes would not be served." *Id.* ¶ 14. Furthermore, its use may be limited in situations where it would subvert other legitimate policy considerations. *See id.* ¶ 15 ("Policy considerations may limit [the] use [of collateral estoppel] where the . . . underpinnings of the doctrine are outweighed by other factors." (third alteration in original) (internal quotation marks omitted)).

¶ 32 Both parties have presented this court with a broad array of cases concluding that workers' compensation adjudications either do, or do not, have preclusive effect in civil lawsuits. These cases involve widely varying facts, procedural postures, and types of defendants. Some concern third-party tort claims. Many do not. In considering the Utah Workers' Compensation statutory scheme, our case law under that scheme, and cases from other jurisdictions, we conclude that while workers' compensation adjudications may be given preclusive effect in some instances, both the policy that justifies workers' compensation and the purposes of the

---

**5.** The Workers' Compensation Act has been amended since the complaint was filed in this case. Because the changes do not substantively affect the provisions at issue here, we cite to the current version for convenience.

collateral estoppel doctrine prevent the application of collateral estoppel in this case.

■■■ ¶ 33 We have held that administrative adjudications may be given preclusive effect. *See Career Serv. Review Bd. v. Utah Dep't of Corr.*, 942 P.2d 933, 938 (Utah 1997); *Salt Lake Citizens Cong. v. Mountain States Tel. & Tel. Co.*, 846 P.2d 1245, 1251 (Utah 1992) ("[T]he doctrine of res judicata has been applied to administrative agency decisions in Utah since at least 1950."). In this context, collateral estoppel generally applies " 'when an administrative agency has acted in a judicial capacity in an adversary proceeding to resolve a controversy over legal rights and to apply a remedy.' " *Career Serv.*, 942 P.2d at 938 (quoting *Mountain States*, 846 P.2d at 1251). In *Stoker v. Workers' Compensation Fund*, however, we suggested that workers' compensation adjudication may not have the same collateral-estoppel applications as other administrative adjudications. 889 P.2d 409, 411 (Utah 1994) (finding that workers' compensation remedies "are not analogous to an ordinary lump-sum judgment that the common law provides for personal injury actions," partly because "an award of benefits does not generally have the res judicata effect of a judgment").

¶ 34 Indeed, if workers' compensation adjudications were given preclusive effect in suits against nonemployer third parties, injured workers would face a vexing dilemma: either elect the more simple and immediate relief afforded by workers' compensation or the more complex but potentially more lucrative civil litigation process. *See Messick v. Star Enter.*, 655 A.2d 1209, 1212–13 (Del. 1995) (explaining this dilemma); *Cunningham v. Prime Mover, Inc.*, 252 Neb. 899, 567 N.W.2d 178, 182–83 (1997) (same). The Utah Workers' Compensation Act does not require an employee to make such an election of remedies.

¶ 35 On the one hand, Utah Code section 34A–2–105(1) clearly explains that a claim under the Workers' Compensation Act is "the exclusive remedy against *the employer* . . . in place of any and all other civil liability whatsoever, at common law or otherwise, to the employee." (emphasis added). Section 34A–2–106, on the other hand, clearly preserves an employee's civil remedies against nonemployer third parties when it states,

(1) When any injury or death for which compensation is payable under [the Workers' Compensation Act] . . . is caused by the wrongful act or neglect of a person *other than* an employer, officer, agent, or employee of the employer:

. . .

(b) the injured employee or the employee's heirs or personal representative may have an action for damages *against the third person.*

(emphasis added).

¶ 36 We decline to read these provisions as permitting an employee to engage third parties in the rigor of litigation while containing an implied threat that rulings made by an administrative law judge in a workers' compensation adjudication may, through the invocation of collateral estoppel, derail the employee's lawsuit. To compel an election of this nature would subvert the general purpose behind workers' compensation, which is "to provide compensation to injured employees 'by a simple and speedy procedure which eliminates the expense, delay and uncertainty' in proving fault." *Wadman Corp.*, 2009 UT 18, ¶ 8, 210 P.3d 277 (quoting *Wilstead*, 407 P.2d at 693). Employees must not be forced to confront such a risk.

■■■ ¶ 37 Furthermore, giving preclusive effect to Ms. Gudmundson's workers' compensation adjudication does not necessarily serve the purposes of collateral estoppel. The district court granted summary judgment based on defensive collateral estoppel, which "prevent[s] a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." [6] *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Typically, courts favor the use of defensive

---

**6.** In contrast to defensive collateral estoppel, offensive collateral estoppel "occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

Offensive use of collateral estoppel . . . creates precisely the opposite incentive [as defensive use]. Since a plaintiff will be able to rely on a previous judgment against a defendant but will

collateral estoppel because it "gives a plaintiff a strong incentive to join all potential defendants in the first action," which, in turn, accomplishes the general purposes of collateral estoppel: increased judicial efficiency, prevention of inconsistent judicial outcomes, and protection of litigants from vexatious lawsuits. *See id.* at 329–30, 99 S.Ct. 645; *Buckner*, 2004 UT 78, ¶ 14, 99 P.3d 842.

¶ 38 Under the unique facts of this case, however, giving preclusive effect to Ms. Gudmundson's workers' compensation adjudication does not promote the purposes of collateral estoppel. Because the Workers' Compensation Act is only available to remedy wrongs committed by employers or their agents, Ms. Gudmundson could not involve third-party defendants in her workers' compensation adjudication even if she had so desired. Accordingly, her subsequent lawsuit against defendants was neither a waste of judicial resources nor an attempt to harass the defendants through vexatious litigation.[7] *See Heine v. Simon*, 702 N.W.2d 752, 762 (Minn.2005) ("[G]iven the exclusivity of the Workers' Compensation Act as a remedy against the employer, invocation of collateral estoppel in an employee's third-party action in a case … where the third party had, and could have had, no involvement in the workers' compensation proceedings does not necessarily serve the purposes of collateral estoppel."). We are therefore unable to discern any of the recognized justifications for the application of collateral es-

toppel in this case. Rather, it appears that the sole effect of collateral estoppel would be to shield third-party defendants from confronting claims the Utah Legislature has expressly preserved for employees under the Utah Workers' Compensation Act. *See* Utah Code Ann. § 34A–2–106. We therefore decline to adopt a rule that would categorically give preclusive effect to workers' compensation adjudications in civil actions brought by an injured worker against nonemployer third parties.

### B. Ms. Gudmundson Did Not Sufficiently Plead Her Alternative Theory of Causation

¶ 39 Ms. Gudmundson also argues that collateral estoppel should not apply in her case because the Utah Labor Commission did not consider the issue of whether her injuries were caused by exposure to ozone byproducts. She argues that because this theory was never presented to the ALJ, it presents a different issue to the district court, one that defeats the requirement of issue congruence necessary for the application of collateral estoppel. We hold that Ms. Gudmundson did not adequately plead her alternative theory of causation.[8]

¶ 40 The issue before us is to what extent a causation theory articulated for the first time in the context of a summary judgment motion must have appeared in prior pleadings in order to command consideration from the district court. To resolve this issue, we turn

not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation. . . .
*Id.* at 330, 99 S.Ct. 645 (citations omitted).

7. Additionally, an employee who receives a favorable outcome from a workers' compensation adjudication would have little hope of enjoying any offensive collateral estoppel use of that result in a third-party civil action. First, the employer would have little incentive to "defend vigorously" the workers' compensation adjudication as compared to the full-blown civil action faced by the third-party defendants. *See Parklane Hosiery*, 439 U.S. at 330, 99 S.Ct. 645. Second, the minimal amount of procedure available in workers' compensation adjudications would likely make offensive use of collateral estoppel unfair, especially because the third-party defendants

would be unable to choose the forum in the first place. *See id.* at 330–31, 99 S.Ct. 645.

8. The district court did not address whether the ozone-byproducts theory constituted a different issue such that the elements of collateral estoppel were not satisfied. Instead, the district court determined that it could not hear the theory because it was not first argued to the ALJ or the Appeals Board. In other words, Ms. Gudmundson had not exhausted her remedies as to that particular theory and was therefore barred from arguing the theory in district court.

We disagree. The Workers' Compensation Act does not require an employee who brings a claim against a third party to first exhaust his or her remedies through the administrative process. *See* Utah Code Ann. § 34A–2–106 (Supp.2009). Regardless, because we find that Ms. Gudmundson failed to adequately plead her alternative theory of causation to the district court, she is precluded from arguing that chemical toxicity caused her injuries.

to our pleading requirements. Our central reference is rule 8 of the Utah Rules of Civil Procedure. Rule 8 mandates that a pleading for a claim of relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Utah R. Civ. P. 8(a). We have consistently noted that Utah's notice pleading requirements are liberal and "all that is required is that the pleadings be sufficient to give fair notice of the nature and basis of the claim asserted and a general indication of the type of litigation involved." *Guardian Title Co. v. Mitchell*, 2002 UT 63, ¶ 15 n. 4, 54 P.3d 130 (internal quotation marks omitted).

¶ 41 Ms. Gudmundson's complaint states only that "ozone overexposure" caused her injuries. Not until her memorandum in opposition to summary judgment did she argue that ozone combined with other chemicals present in the laundry facility caused the formation of ozone byproducts, which caused her to develop symptoms indicative of chemical toxicity. Although ozone overexposure and ozone-byproduct toxicity may not be mutually exclusive concepts, they depend on different factual theories and present different types of legal liability. For instance, one could be strictly liable for the ozone overexposure if the ozone generator is found to be defective. A claim that the presence of ozone combined with other chemicals ordinarily present in a laundry facility caused injury to a specific employee, however, sounds in negligence. Ms. Gudmundson's failure to give appellees notice that she intended to pursue both theories precludes her from arguing that chemical toxicity caused her injuries.

## IV. THE DISTRICT COURT ERRED WHEN IT GRANTED SUMMARY JUDGMENT TO DEL OZONE ON THE GROUNDS THAT MS. GUDMUNDSON HAD FAILED TO PRODUCE SUFFICIENT EVIDENCE THAT DEL OZONE'S GENERATOR WAS DEFECTIVE

¶ 42 In addition to granting defendants' summary judgment motions on the basis of

collateral estoppel, the district court also granted summary judgment to Del Ozone, the manufacturer of the ozone generator, on the ground that Ms. Gudmundson had "failed to produce evidence that Del Ozone's ozone generator was defective." Ms. Gudmundson argues that summary judgment was improper because she presented sufficient evidence that (1) the ozone generator was unreasonably dangerous due to a design defect[9] and (2) even if the generator itself was not defective, Del Ozone is liable for defects in the ozone-disinfection system as a whole.

¶ 43 We agree with Ms. Gudmundson and hold that the district court erred when it granted summary judgment to Del Ozone. Ms. Gudmundson presented sufficient evidence to create a genuine issue of material fact as to whether (1) the ozone generator itself was defectively designed and (2) the ozone-disinfection system as a whole was defective under a component-parts theory.

 ¶ 44 Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). When reviewing a trial court's grant of summary judgment, "we give the court's legal decisions no deference, reviewing for correctness, while reviewing the facts and inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 15, 13 P.3d 581.

 ¶ 45 "Products liability always requires proof of a defective product, which can include 'manufacturing flaws, design defects, and inadequate warnings regarding use.'" *Bishop v. GenTec, Inc.*, 2002 UT 36, ¶ 25, 48 P.3d 218 (quoting *Grundberg v. Upjohn Co.*, 813 P.2d 89, 92 (Utah 1991)). The liability "is for the defective product, and not merely for any underlying negligence." *Id.*

---

9. Although it is not entirely clear whether Ms. Gudmundson argued that the ozone generator had a manufacturing defect or a design defect, we interpret her argument that the generator was unreasonably dangerous because it did not contain an ambient air monitor or automatic shut-off valve as a design defect claim.

### A. Ms. Gudmundson Presented Sufficient Evidence That the Ozone Generator Had a Design Defect

¶ 46 The district court held that Ms. Gudmundson "failed to produce evidence that Del Ozone's ozone generator was defective." [10] Ms. Gudmundson argues that the evidence presented to the district court was sufficient to create a disputed issue of material fact as to whether the generator was defectively designed. Specifically, she argues that the generator lacked an ambient air monitor or a shut-off valve that would automatically shut down the system if pollutant levels exceeded federally mandated EPA or OSHA limits. Del Ozone argues that an absence of air monitors and shut-off valves does not qualify as a defect for purposes of products liability, strict liability, negligent manufacture, or breach of implied warranty. Rather, Del Ozone argues that such monitors and shut-off valves are accessories, the absence of which does not evidence a defect in the design of the generator.[11]

¶ 47 Under the Utah Product Liability Act, a product is defective if it is "unreasonably dangerous" at the time of sale by the manufacturer.[12] Utah Code Ann. § 78B–6–703(1) (2008). The Act defines a product as "unreasonably dangerous" if it

was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer.

*Id.* § 78B–6–702.

¶ 48 Ms. Gudmundson argued to the district court that the generator lacked certain features that made it unreasonably dangerous: an ambient air monitor and an automatic shut-off valve. Del Ozone, in contrast, argued that such features are accessories, the inclusion of which has no bearing on whether the generator is unreasonably dangerous. Viewing the facts and resulting inferences in a light most favorable to Ms. Gudmundson, we conclude that she presented sufficient evidence to create a question of material fact as to whether the ozone generator was unreasonably dangerous at the time of sale and therefore defective.

¶ 49 Ms. Gudmundson presented the deposition of Mr. Downey, the owner of OzoneSolutions, who concedes that the generator lacked certain shut-off features and that these features are available and sometimes installed with other generators.[13] She also

10. It is unclear whether the district court concluded that Ms. Gudmundson failed to produce evidence that the generator was defective under a defective product theory, design defect theory, or both. Because we find that Ms. Gudmundson produced evidence sufficient to overcome summary judgment on a design defect theory, we address that issue alone.

11. Del Ozone also argues that the generator was not defective because it (1) never "malfunctioned in any way" and (2) "was not defective when it was installed." These arguments would refute an assertion that a particular generator was defective. But Ms. Gudmundson argues that the generator was defective *as designed* because it did not contain an ambient air monitor or an automatic shut-off valve. In other words, even if the generator performed exactly as intended, its design was still unreasonably dangerous to the prudent user.

12. In 2008, the Utah Legislature revised and recodified Title 78. The Legislature moved the Utah Product Liability Act from sections 78–15–1 to –7 to sections 78B–6–701 to –707. Because

the change does not affect our analysis and because the Utah Product Liability Act was held constitutional as amended in *Egbert v. Nissan Motor Co.*, 2010 UT 8, ¶¶ 9–10, 21, 228 P.3d 737, we refer to the current numbering scheme. Under that scheme, section 78B–6–703(1) provides

In any action for damages for personal injury, death, or property damage allegedly caused by a defect in a product, a product may not be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.

13. It is unclear from the record whether the shut-off valves and ambient air monitors are physically attached to the generator or to other parts of the ozone-production system. Of course, this inquiry is necessarily a part of whether the lack of the shut-off features constitutes a design defect with the generator itself and is therefore a determination more suitable for the trier of fact. If the features are indeed accessories with no

presented the district court with a portion of the Occupational Safety Hazardous Occupation Encyclopedia, which specifically states, "[w]hen ozonizers are installed, they should be provided with ozone specific detectors." Additionally, Ms. Gudmundson attached emails between the parties and prison officials that suggest the ozone levels at the prison exceeded acceptable levels and that the system was shut down at least once due to ozone levels. This is not a situation where Ms. Gudmundson has argued that merely because she was injured, the product must have been defective; rather, Ms. Gudmundson specifically alleges that a product is defectively designed because it lacks certain features. *See Kleinert v. Kimball Elevator Co.*, 854 P.2d 1025, 1027 (Utah Ct.App.1993) (holding the mere allegation that "because she was injured, the [product] must have been defective" was not enough to survive summary judgment); *Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 418 (Utah Ct.App. 1994) ("[I]t is not enough to simply show that the product failed.").

¶ 50 We therefore reverse the district court's determination that Ms. Gudmundson presented insufficient evidence that the ozone generator was defective and remand for consideration of the claim. Additionally, as explained below, the district court prematurely granted summary judgment to Del Ozone because Del Ozone may be liable for defects in the ozone-generator system.

**B. The District Court Erred When It Granted Summary Judgment to Del Ozone Because a Manufacturer of a Nondefective Product May Be Liable for the Design Defects of a System**

¶ 51 The district court's order granting summary judgment to Del Ozone focused on Ms. Gudmundson's failure to present evidence that the generator itself was defective. During the hearing on the summary judgment motions, however, the district court noted, "While it is true that there appears to be some evidence that there may have been

some venting issues, I found nothing that indicated factually a problem with the generator itself."

¶ 52 Ms. Gudmundson now argues that the district court erred and that Del Ozone is liable for design defects that may exist in the ozone-disinfection *system* as a whole. Ms. Gudmundson points to deposition statements made by the owner of OzoneSolutions, Mr. Downey, that in the past he had collaborated with engineers from Del Ozone on the design of ozone-generator systems and purchased all the component parts necessary for the Utah Prison system from Del Ozone. Del Ozone argues that it merely filled OzoneSolutions' purchase order, and that OzoneSolutions was the only party responsible for selecting the size of the generator and installing the necessary components for the system. The question before us then is not whether defects actually exist in the design of the system, but whether Del Ozone, as a component manufacturer of a nondefective product, may be held liable for any defects in the system.

¶ 53 Although this court has not explicitly addressed to what extent installation of a nondefective product in a defective system results in tort liability, we have required that

> in order to recover on strict liability against a seller, the plaintiff must prove (1) that a defect or defective condition of the product made it unreasonably dangerous, (2) that the defect was present at the time of the product's sale, and (3) that the defective condition was the cause of the plaintiff's injuries.

*Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 2003 UT 43, ¶ 16, 79 P.3d 922. The rule set forth in *Schaerrer* provides the boundaries of manufacturer liability, but it does not provide guidance on what constitutes a "product" or when movement of the "product" constitutes a "sale."

¶ 54 To answer this question, we find sufficient guidance in the principle known as

---

bearing on the nondefectiveness of the generator, the absence of the features may still be a design defect of the entire ozone-generator *system*. Additionally, on remand, Ms. Gudmundson must show that the defect, if any, caused her injuries.

*See Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 418 (Utah Ct.App.1994) ("It is not enough to merely contend that a defect existed, show that an accident occurred, and assume the two are necessarily related.").

the "component-parts doctrine." Under this doctrine, a manufacturer of a component part who participates in the design of the final product or system may be held liable for injuries caused by the final product even if the component itself was not defective. *See, e.g., Davis v. Komatsu Am. Indus. Corp.*, 42 S.W.3d 34, 38–39 (Tenn.2001) (providing exhaustive list of jurisdictions that have adopted the doctrine); *see also House v. Armour of Am.*, 886 P.2d 542, 553 (Utah Ct.App.1994) ("[S]trict liability for a component manufacturer is limited when that component is integrated into a larger unit, thus, '*if the component part manufacturer does not take part in the design or assembly of the final system or product,* he is not liable for defects in the final product if the component part itself is not defective.'" (emphasis added) (quoting *Koonce v. Quaker Safety Prod. & Mfg. Co.*, 798 F.2d 700, 715 (5th Cir.1986))).

¶ 55 The Third Restatement of Torts, *Products Liability*, section 5 sets forth the elements required for nondefective component-manufacture liability. It states:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> . . .
>
> (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
>
> (2) the integration of the component causes the product to be defective, as defined in this Chapter; and
>
> (3) the defect in the product causes the harm.[14]

¶ 56 The Third Restatement embraces the policy-based rationale that although manufacturers of nondefective component parts at the time of sale should not bear the risk of ensuring the integrated product's safety, a component manufacturer who participates in the design of the product should bear some

liability risk. Because we find this policy-based rationale persuasive, we adopt this section of the Third Restatement.

¶ 57 Liability under the Third Restatement for a nondefective product requires two findings. First, the participation must be substantial. Second, the integration of the nondefective component must cause the integrated product to be defective. Restatement (Third) of Torts: Prods. Liab. § 5(b)(1)-(2) (1998). We now discuss the meaning of both elements.

¶ 58 First, the manufacturer of a nondefective component must have substantially participated in the design of the integrated product. *Id.* § 5(b)(1). To substantially participate, the manufacturer must have had some control over the decision-making process of the final product or system. *See Jacobs v. E.I. du Pont de Nemours & Co.*, 67 F.3d 1219, 1242 (6th Cir.1995) ("[W]here a component part is not dangerous until incorporated into a finished product, courts have held that the component-part supplier cannot be held liable . . . unless the supplier exercised some control over the *final* product's design."); *Noonan v. Texaco, Inc.*, 713 P.2d 160, 164 (Wyo.1986) (holding that summary judgment was proper when defendants "manufactured only component parts" and "had no control over the manner in which [the final product] was constructed," or the "decision[s] concerning the assembly of safety features"). The requirement that a component manufacturer have some control over the design of the integrated product prevents the imposition of a duty to "foresee all the dangers that may result from the use of a final product which contains its component part or materials." *Bond v. E.I. Du Pont De Nemours & Co.*, 868 P.2d 1114, 1118–19 (Colo.Ct.App.1993) (holding a manufacturer of Teflon not liable for injuries caused to patients given TMJ implants partially made from Teflon). For instance, a component manufacturer does not have a duty to analyze or anticipate the design of the product or system of which its compo-

---

14. We do not quote section (a) of the Restatement because it only addresses situations in which the component part itself is defective. Because this situation is adequately addressed in our case law, we do not wish to create confusion by applying the Restatement to those situations.

**1074**

nent is a part nor does knowledge of the ultimate design by itself constitute substantial participation. *See Childress v. Gresen Mfg. Co.,* 888 F.2d 45, 48–49 (6th Cir.1989); *Zaza v. Marquess & Nell, Inc.,* 144 N.J. 34, 675 A.2d 620, 629–30 (1996) (The duty underlying the component-parts doctrine does not extend to "the anticipation of how manufactured components not in and of themselves dangerous or defective can become potentially dangerous dependent upon the nature of their integration into a unit designed, assembled, installed, and sold by another." (internal quotation marks omitted)).

¶ 59 Liability for failure to install a safety device therefore depends on whether the component manufacturer was in a position to control the decision making involved in the design of the integrated product. Requiring that a component manufacturer have control over the decision making involved in the design of the integrated product ensures that "[m]ere suppliers [are not] expected to guarantee the safety of other manufacturers' machinery." *Crossfield v. Quality Control Equip. Co.,* 1 F.3d 701, 704 (8th Cir.1993). The act of "simply design[ing] a component to its buyer's specifications" or "providing ... technical services or advice" about the component does not in and of itself constitute substantial participation in the design of the integrated product. Restatement (Third) of Torts: Prods. Liab. § 5 cmt. e. However, if the specifications provided are obviously unreasonably dangerous, the component manufacturer may be deemed to have control over the integrated product and therefore be deemed to have substantially participated. *Zaza,* 675 A.2d at 629.

¶ 60 Second, under the Restatement, the integration of the nondefective product must also cause the integrated product to be defective. Restatement (Third) of Torts: Prods. Liab. § 5(b)(2). The Restatement therefore places another factual limitation on when a manufacturer of a nondefective product that substantially participates in the design of the integrated product may be liable.

¶ 61 Because we adopt the component-parts doctrine today, the district court understandably did not make factual findings on whether the ozone generator is a nondefective component, the integration of which caused the system to be defective, or whether Del Ozone substantially participated in the design of the system installed at the prison. The district court also did not make findings on whether the ozone-generator system was defective in its totality. We therefore remand to the district court for a determination of whether Del Ozone is liable as a component manufacturer for defects, if any, in the ozone-disinfection system.[15]

**CONCLUSION**

¶ 62 We hold that the district court did not abuse its discretion when it declined to grant Ms. Gudmundson's rule 56(f) motion. Although Ms. Gudmundson is not entitled to further discovery, we reverse the district court's grant of summary judgment in favor of the defendants on the basis of collateral estoppel. But Ms. Gudmundson's alternative argument, that ozone-byproduct exposure is a different issue than ozone overexposure and therefore not subject to collateral estoppel was not sufficiently pled; the district court therefore did not err in failing to consider it. Finally, we hold that the district court erred as a matter of law in finding that Ms. Gudmundson did not sufficiently allege that the ozone generator was defective. First, Ms. Gudmundson provided sufficient evidence to create an issue of material fact as to whether the generator itself had a design defect. Second, because we adopt the component-parts doctrine today, we remand with instructions that the district court apply that doctrine to Del Ozone consistent with this opinion.

¶ 63 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING's opinion.

---

15. We note that the district court's order granting summary judgment to Del Ozone does not address Ms. Gudmundson's negligence claims.

Our treatment of the component-parts doctrine reaches only those claims brought under a products liability theory.